## JOSEPH W. SMITH
### v.
## MARIE L. HENRY.

*Breach of Promise to Marry—For Work and Labor—Evidence—Instruction.*

In an action of assumpsit brought by appellee against appellant on an alleged promise to marry and for work and labor, this court holds that the evidence justified a verdict for the plaintiff on both items, and that the errors in the instructions and the admission of evidence, if any, were trivial and unworthy of consideration.

[Opinion filed April 11, 1892.]

APPEAL from the Circuit Court of Douglas County; the Hon. E. P. VAIL, Judge, presiding.

Messrs. CRAIG & CRAIG and P. M. MOORE, for appellant.

Smith v. Henry.

Messrs. HORACE S. CLARK and C. W. WOLVERTON, for appellee.

MR. JUSTICE PLEASANTS.  This was an action of assumpsit brought by appellee against appellant on a promise to marry and for work and labor.  A trial by jury under the general issue resulted in a verdict for plaintiff for $4,601.45, of which $1,101.45 was for wages.  The court overruled defendant's motion to set it aside, and rendered judgment for the plaintiff for the amount so found.

Appellant was a large farmer and stock raiser, employing from three to fifteen hands, and worth, as the evidence tends to show, $30,000 or more over and above all his indebtedness.  He had been twice married, was divorced from his first wife, by whom he had a daughter, his only child and still with her mother, and his second wife was living apart from him.  Appellee had never been married; was about thirty-five years of age when she went into the service of appellant, of fair education, and though raised on a farm, had afterward been variously employed and acquired some knowledge of business.  At his request she went from Chicago, where she was then residing, to his place in Douglas County, on the first Sunday in April, 1884.  No specific agreement as to wages was then made, perhaps because it was expected that she would remain but a short time.  In his letter to her he had said: "I am in need of a woman right at this time, have four or five men for about ten days, thereafter, two.  Could you do for a month or so until I could pick up a stronger woman?"  She did remain, however, until February 27, 1890, and according to the testimony during all that time did an amount and variety of work that was really remarkable.  It does not appear that there was any other woman employed about the house.  In addition to all the cooking, washing, ironing and chamber work, she did appellant's mending and darning, made his night shirts, cut his hair and trimmed his whiskers, picked the geese and filled and covered the pillows, often watered the stock when he was absent, in good part did the milking,

raised turkeys, and in every way she could made herself useful. He says she was up early, worked as hard as he (and he claimed to be uncommonly industrious) and continued to work after the others were done. Besides this manual labor, she was charged with a large measure of responsibility; was his housekeeper and adviser; attended to the management of the farm when he was away and to his outside business; drew checks and signed other papers in his name, and was intrusted with the money for household expenses, of which she kept full and accurate account. While the going wages of women hired by farmers was from $2.50 to $3 per week, it is clear from the correspondence between these parties and other evidence produced, that appellee was much more than the ordinary employes who receive such wages. It was testified that appellant stated he would pay her $5 per week, and by a number of witnesses that her services were reasonably worth it. She claimed that amount. For the money he had given her from time to time, aggregating about $500, and of which she had kept an account that was not disputed, the jury appear to have given him credit, and allowed her the balance according to her claim, with interest from the commencement of the suit.

If there was talk between them looking to their marriage, it may help to account for the fact that she ceased to press for a specific agreement about wages, and that fact may help to show there was such an understanding. Appellee testified that there was such talk from the beginning of her service; that she did not know he was married, until some time in the summer of 1884, when she learned it from the record in his family Bible; that upon her inquiry of him about it he told her he intended to get a divorce; that he promised to marry her before that time, and afterward, and after he got his divorce (which it appears he did get by decree of the Circuit Court of Douglas County at its November term, 1887), and that on the 17th of October, 1888, he placed upon her finger an engagement ring. Her statement was the only direct evidence of such a promise. Appellant admitted the giving of the ring but denied that it

Smith v. Henry.

was an engagement ring or given as such, and denied that he ever promised to marry her, but admitted that he had kissed her many times; that his intentions were then honest, that perhaps he then loved her, and that she often told him she loved him. As tending to corroborate her and show a marriage engagement, a number of letters from him to her, with other evidence, on both sides, of their relations and conduct toward each other, were introduced, which it would be useless to consider in detail. It shows, what is not denied, that they were unduly intimate from the first, and although not showing of itself a promise of marriage, we think, throws some light upon that question and was proper to be considered by the jury in determining it.

Complaint is made of the admission of three or four facts out of the great mass as irrelevant and calculated to prejudice appellant in the minds of the jurors. As far as we can gather from the argument, they are the following only : First. Appellant having stated that appellee sold turkeys she raised and got the money, she was asked by her counsel, "Did he sell some to beat you out of this law suit?" and answered, "I think he did." The question was leading, if not otherwise objectionable; but the abstract fails to show it was objected to, and the answer was of no account. Second. Appellee was asked on cross-examination if he hadn't had two wives; if the first was not also living, and if he didn't have a grown daughter. It is said this was not proper cross-examination, and that the matter was irrelevant and prejudicial. As to this also the abstract fails to show any objection at the time. We think it was proper cross-examination, and if it was not the facts already otherwise and properly appeared (from his letters), and therefore it could do no harm. Third. A valentine—coarse caricature of a woman, labeled "Flatterer," and some uncomplimentary doggerel—which appellee said she received after the commencement of the suit, in an envelope addressed to her in appellant's handwriting, but which he denied, was admitted over objection, and flourished by counsel, as is said, before the jury in argument. We think the circumstance too trivial for serious consideration.

It is claimed that this evidence did arouse the prejudice of the jury and it controlled their finding, for otherwise they could not have disregarded, as is assumed, the evidence of appellee's letter of December 16, 1882, and the testimony of Mrs. Jones and Mrs. Ours. We can not know that they disregarded them. The jury may have thought this evidence did not prove what is claimed for it. In the absence of appellant's letter, to which that of appellee refers and was a reply, the construction put upon it by counsel may not be the true one. But what is the relevancy of appellant's misconduct in 1882, if it were clearly proved, to the question whether appellant promised, in 1884 and later, to marry her? If her letter plainly showed her character, then he had knowledge of it before the alleged promise, and if he in fact made it, he can not set up that character as a justification of its breach.

Finally, it is urged that there was no proof of the acceptance by appellee of the alleged promise. She testified that on one occasion she offered to release him from the engagement if he would pay her for her work; that he placed an engagement ring on her finger; and all her statements about the promise plainly implied mutuality. If the jury believed that he proposed, they could not sensibly doubt that she accepted.

No point is suggested against the instructions given for plaintiff except that they authorized the jury, in determining whether there was a marriage contract, to "take into consideration all the evidence as well as all the circumstances, as shown by the proof." Walmsley v. Robinson, 63 Ill. 41, is cited to show that this was too broad. In that case the jury were told that they might "infer a promise" from particular circumstances, severally mentioned, among which was "visiting," and the Supreme Court held that this authorized the inference from the circumstance of visiting, alone, and was too broad. We apprehend, however, that upon the question of a promise to marry, frequent visits by the gentleman to the lady would be a circumstance proper to be "considered," in connection with all others. The in-

struction here clearly means all the evidence and circumstances in proof bearing upon the question to be determined, and in that meaning we thing it was proper.

It does not appear that any instruction asked for by the defence was refused or modified. , Those given were much more full and particular than plaintiff's, and were quite as favorable to him as the law and the evidence would warrant.

The judgment will be affirmed.

*Judgment affirmed.*